Judge Marshall
delivered the following Opinion of the Court in this case, on the 31st of October last; but a petition for a rehearing was afterwards presented, by which the decision was suspended, and the case remained under advisement until this day, when the petition being overruled, the Opinion became final.
In 1807, Mrs. Chinn, afterwards Mrs. Hughes, sold and conveyed to Asa Wilgus, about ninety-six acres of land, and took a mortgage on the same, for securing the payment of the purchase money, which was to be completed in 1813.
In 1812 and 1816, Wilgus sold and, by two deeds, conveyed the whole of the land to Richard Patterson; who paid a fair price for it as unincumbered, took possession, and has ever since used and improved it as his own. All of these deeds were duly recorded.
In 1818, Wilgus having failed to complete the payment due from him for the land, and having replevied the judgments obtained for the balance remaining unpaid, filed his bill in chancery, praying to enjoin the collection thereof, and to rescind his purchase from Mrs. Chinn, and his sale to Patterson. An injunction was granted, agreeably to the prayer of the bill, and John Pope became the security of Wilgus in the injunction bond, which was made payable to Hughes and wife and Patterson.
Patterson, who was a defendant to this bill, opposed the rescission of the contracts, alleging his satisfaction with the title, and that he had fully paid the price of the land to Wilgus: which fact is also to be inferred from, if it is not directly admitted by, the bill.
The injunction was finally dissolved, and the bill dismissed; and, on the appeal of Wilgus to this Court, the decree was affirmed, in 1820.
In 1826, judgment was obtained on the injunction *242 bond, in the names of Hughes and wife and Patterson, and against Pope alone, for so much of the original purchase money as remained due, together with the accumulated costs, interest, and damages; and in 1826, an execution on this judgment, was levied on the property of Pope. An arrangement was then made between Pope and Christopher Chinn, who had the benefit and control of the judgment, whereby Pope, in discharge of the judgment, became the security of Chinn, in a note to the Bank of the Commonwealth of Kentucky, for a sum equal to the amount of the execution, on which he was to pay the calls and discounts until the debt was extinguished; and he was allowed the privilege of seeking his indemnity by prosecuting, at his own costs, a suit for the foreclosure of the mortgage, in the name of the mortgagee.
The bill &c.
Under this arrangement, the present suit was brought, in the name of Mrs. Hughes, then again a widow, but in fact for the indemnity of Pope; who, shortly after its commencement, relieved Chinn from the debt to the Bank of the Commonwealth, by substituting his own note for it. The administrators of Hughes were afterwards joined as complainants, and the answer of Patterson, which was made a cross bill, brought Pope and Christopher Chinn before the Court.
By the final decree, the land was decreed to be sold, for the satisfaction of the entire amount of the judgment against Pope.
It appears that, at the time of obtaining the injunction, and at the time of its dissolution, Wilgus was solvent, and the debt might have been made out of his property; but before the appeal was determined, he became insolvent, and is since dead, leaving nothing for the satisfaction of his debts. The security in the replevin bond also became insolvent in the interval; and Pope, having no prospect of indemnity from Wilgus is seeking to throw the loss upon Patterson, by means of the mortgage; and has succeeded in doing so if the decree can be sustained. This is attempted to be done on the ground: first — that Pope having paid the debt as security to the mortgagor, is entitled to the lien which the creditor had by virtue of *243 the mortgage; and, second — that if any thing more were wanting, the arrangement by which he was allowed to prosecute this suit, secures to him the benefit of the lien.
A surety who has paid the debt, has, has to the person and property of the debtor, a right to take the place of the creditor, so far as to have the same preference over general creditors that the creditor would have had, and may have the benefit of any mortgage, lien, or other collateral security, that the creditor has; and, in general, a court of equity will require the creditor to transfer all such securities to the surety who pays the debt, or permit him to use the creditor’s name to make them available. But this principle will not be applied to defeat an interest acquired and held by a third person, when that interest, tho’ subordinate to that of the creditor, is prior in date, to the undertaking of the surety—as where property is mortgaged for a debt, then sold by the debtor ; the debt afterwards replevied, and paid by the replevin surety; the latter cannot use the mortgage to defeat or affect the rights of the purchaser. Sureties, in such a case, come in trusting to the principal debtor, and can take the place of the creditor so far only as the person and property of the debtor alone may be affected.
It is contended in support of the decree, “that, in equity, a surety who has discharged the debt, is entitled to stand in the shoes of the creditor as to all liens securing the debt.” If this be so, and can be applied to this case, the surety who pays the debt may, under any and all circumstances, stand as the assignee and purchaser of all liens for securing it, and his title would, of course, overreach all intermediate interests in the pledged property, arising subsequently to the date of the lien, though prior to the commencement of his obligation. The authorities referred to do not support the position to this extent. Nor can we admit that the doctrine, to this extent, has any foundation in equity or reason. Some of the elementary writers upon the subject, have stated the principle as broadly as it is now contended for, and in some of the adjudicated cases, dicta may be found which seem to countenance it to nearly the same extent. But these are cases in which the right was presented in its simplest form, and discrimination was not necessary. We have seen no case in which it has been decided, either in terms or in effect, that a surety becoming so by entering into an obligation taken in the prosecution of the ordinary coercive remedies against the person of the debtor, can, by -paying the debt, acquire such an interest in the mortgage or other lien of the creditor, as will enable him to displace any pre-existing, specific interest in the mortgaged property, derived from the debtor after the date of the mortgage.
In the case of Lidderdale vs. Robinson's Executor (12 Wheaton, 594,) referred to in argument, the question was, whether a co-acceptor of a bill of exchange, who had paid more than his portion, should be so far substituted to the creditor’s rights, as that his demand against the estate of the other acceptor, should be considered to be of the same dignity, and entitled to the same priority, *244 as the debt itself which he had paid, and this question was determined in the affirmative. This decision and the cases referred to, establish the doctrine, that as to the person and property of the debtor, the surety is entitled to stand in the place of the creditor, so far as to have the same preference over general creditors, which the creditor himself would have had, if the debt had remained unpaid. And it may be admitted that, in case of a lien, he would be substituted to it, so far as to give him the same preference over' general creditors. But these cases do not decide the question produced by a pre-existing specific interest in the property, by reason of which it ceases to be in fact the property of the debtor before the surety becomes bound. Nor do they touch the question as to the rights of the surety who comes in as surety in an obligation incidental to the prosecution of the legal remedy against the debtor, and therefore not by the act or consent of the creditor.
In the case of Parsons vs. Briddock, 2 Vernon, 603, which seems to be a leading case on the rights of sureties, the creditor had arrested the principal debtor, who gave bail, and the bail were afterwards fixed, and a judgement obtained against them. But the original surety was subsequently compelled to pay the debt, and prayed, in chancery, for an assignment of the judgment against the bail. This was ordered by the Lord Keeper, who determined that the bail stood in the place of the debtor, and that the original surety was not to be contributory to them.
It seems to have been supposed that this decision establishes the principle that the surety has precisely the same right that the creditor had, and was to stand in his shoes. But this is extending the decision greatly beyond its real import and effect; for, in the first place, it only establishes the right of the original surety against the bail who came in afterwards, and does not establish his right against any pre-existing interest or party. And, secondly, considering the bail themselves as sureties, it certainly establishes the principle that they would not have been entitled to stand in the place of the creditor in regard to the previous surety, if they had paid the' *245 debt; and it thus negatives the proposition that a surety, under all circumstances, is entitled, on paying the debt, to stand in the shoes of the creditor.
In the case of Ormsby vs. Tarascon, 3 Littell's Rep. 414, this Court say, they are aware that equity will sometimes substitute a surety who has paid the debt, and invest him with the rights of the creditor over the debtor, by directing the lien to be assigned. In the same case, (p. 413,) they also say, the execution of a replevin bond by sureties for the debtor, might extinguish the creditor’s lien, (which in that case was an implied one,) but could never transfer or assign it; thus admitting that, although the lien were not extinguished, the sureties did not become entitled to it by entering into the bond: they did not, however, determine the effect of a subsequent payment of the debt by the sureties. But, as they did determine that the sureties had entered into the bond, trusting to the principal debtor only, it may be implied that they would not have considered him entitled to the benefit of the lien, so as to affect prior interests, but only so far as to enable them to reach any interest which the debtor himself may have had in the property, either when they paid the money, or when they entered into the bond. This would doubtless have been allowed to the bail, who were parties in the case of Parsons vs. Briddock, supra, had they paid the debt. But they could not have gone back upon the original surety, because, having come in as sureties of the debtor only, they were not entitled to the creditor’s remedy against the prior surety. And the true meaning of the case, as we understand it, is that, as the creditor was pursuing the principal debtor only, the bail were only bound for him, could, therefore, have looked only to him and his property if they paid the debt, and were entitled to no other remedies of the creditor but against him and his property.
The true principle and object of the substitution of the surety, is to effectuate his right to be remunerated by the principal debtor whose debt he has paid. For this purpose, he is, in general, entitled, in equity, to all the remedies of the creditor against the person and the *246 property of the debtor. But we' are not prepared to admit that, in any case, this equitable right of remuneration from the principal debtor, is a sufficient foundation for disregarding, or subjecting to its satisfaction, the interests of third persons, which, although they may be subordinate to the lien of the creditor, are prior in date, and more specific in character, than the equity of the surety; which cannot commence until he becomes bound for the debt, if indeed it can commence before he pays it. Without, however, intending to determine the proper limits of the right of a surety whose obligation is. coeval with the debt itself, or who comes in afterwards, by the act, or with the consent of the creditor, and who may be supposed to have some peculiar equity against him, we are decidedly of the opinion that, a surety who first comes in as surety in an obligation incidental to the prosecution of the legal remedy against the person of the debtor, is prima facie to be considered as trusting to his principal only, for whom alone he is surety, that upon his paying the debt, he is entitled to stand in the creditor’s place, only as to his remedies against the person and property of the principal, and that, as to any prior surety, or any prior interest in the property which may be under pledge, he must occupy the place of the debtor.
This conclusion,-which is in some degree sustained by the cases of Parsons vs. Briddock, and Ormsby vs. Tarascon, and seems to be directly opposed by none of the cases, may be illustrated by examples of familiar occurrence. Suppose an individual to procure a credit for another, not by becoming his surety in form, but by-giving a mortgage on his own property to secure the debt of the other. The creditor, instead of proceeding upon the mortgage, proceeds against the debtor, and in the course of that proceeding, the debt is replevied and is ultimately paid by the replevin surety: would he be entitled to go back for his indemnity upon the mortgaged property of the stranger, which the creditor had sought to relieve by coercing the debt from the debtor himself? Or, if a creditor take a mortgage from the debtor himself, and afterwards, upon a further advance *247 of money, take a second mortgage upon the same land for'its security — would the replevin surety who might pay the first debt, be substituted to the rights of the creditor under the first mortgage, so as to be preferred to the same creditor’s right under the second mortgage? Or, if the second mortgage were taken by a different creditor, would he be postponed to the replevin surety' who had paid the first debt?
In all these cases, as it seems to us, no contract appearing between the creditor and the surety, and none being to be presumed, the surety must be considered as coming in in furtherance of the remedy adopted by the creditor, and his obligation as in effect a part of it, he must be deemed to have come in trusting to the debtor personally, and he has no right to be substituted to the remedies of the creditor, further than will enable him to reach the debtor and his property, without affecting the interests of any actual incumbrancer who has intervened, between the date of the lien and the date of his obligation. That the interest of a second mortgagee, though he have full notice of the first, is recognized and supported by a Court of Equity, in subordination to the first mortgage, is entirely certain; and unless the surety is to be considered as entitled, in all cases, to stand as a purchaser of the first mortgage, upon paying the debt secured by it, which we do not admit, and which seems to be negatived by the cases of Ormsby versus Tarascon, and Parsons versus Briddock, we do not perceive on what principle this prior specific equity of the second mortgagee, (or' of a purchaser for full value after the first mortgage,) can be postponed to the subsequent equity of the surety, which is certainly not more specific, nor more meritorious.
Patterson did not purchase the mere equity of redemption in the land, but purchased the whole estate, at what would have been a fair price, if it had been unincumbered. It may be inferred from the evidence, that he had not actual notice of the mortgage, but whether he had or not, the mortgage having been recorded, his purchase was subject to it until the debt, should be paid, or the lien relinquished or lost by the act or laches of *248 the creditor. And even if he had actual notice, he undoubtedly acquired a specific equity in the land, subordinate only to the creditor’s lien, and which placed him in an attitude at least as favorable as that of a second mortgagee.
A mortgagor sold the estate to a fair purchaser, for its full value. The mortgagee, favoring the purchaser, resorted to his legal remedy upon his debt, and recovered a judgment, which was first replevied, and then enjoined. When the surety executed the injunction bond, he had full knowledge of the sale; and the debtor was then able to pay the debt; but, ultimately, the payment, with interest, damages and costs, was coerced, by suit, from the surety in the injunction bond: that, even if the surety in the replevin bond could have had the benefit of the mortgage — which is not admitted still, the surety in the injunction bond, who was involved solely by his own act without the concurrence of the creditor, certainly cannot; he has no equity either against the creditor, or the purchaser. The purchaser would have a better right, in equity, to compel the surety to pay the debt and relieve the land of the incumbrance, than the surety has to have it taken from the purchaser and sold for his benefit.
*248 But while it is doubtful whether Patterson had notice in fact of the existence of the mortgage, it is certain that the mortgagee was well apprized of the character and extent of Patterson’s purchase, and not only acquiesced in it, but encouraged it, by receiving from him a part of the purchase money, in discharge of the mortgaged debt, and by looking on while he paid a full price for the land, and improved and enjoyed it as his own, without warning him that it would be resorted to, in the first instance, for the debt, or even mentioning the existence of the mortgage. As the mortgage was recorded, these circumstances were not sufficient to impair its efficacy, but they certainly imposed some obligation upon the mortgagee, to endeavor, as far as his own convenience would allow, to throw’ the burthen of the debt., in the first instance, upon the debtor, without disturbing the purchase of Patterson. And it may be presumed to have been, in part at least, in obedience to this dictate of benevolence and justice, and for the purpose of relieving Patterson’s interest from the burthen of the mortgage, that the mortgagee elected to pursue the personal remedy against the debtor. The debtor himself had no equity to throw the creditor back upon the mortgage, and thus to make Patterson pay the debt. On the contrary, he was under the strongest obligations to pay it himself, and to relieve Patterson’s interest. And it appears to us impossible, that even a replevin surety, coming in aid of the debtor in the performance of this personal obligation to Patterson, and coming in, also, in aid of the remedy, the success of which was to benefit Patterson, could, by performing his undertaking, acquire any equity, either through the debtor or the creditor, inconsistent with the obligations of both, and with the end and object of the remedy which the creditor was pursuing.
But, if there could be any doubt as to a replevin surety, *249 Pope, who came in as surety, not to promote the fulfilment of these obligations, but to postpone, if not to defeat it, by enabling Wilgus to enjoin the debt, occupies a more unfavorable attitude than a replevin surety. From the open and long-.continued possession of the land by Patterson, as well as from the statements and admissions of the bill of Wilgus, praying for the injunction, Pope is chargeable with a knowledge of the purchase of Patterson, and of the obligation of Wilgus to relieve Patterson’s interest from the mortgage, by paying the debt. He knew, too, that Wilgus was solvent and able to pay, and that the creditor was pursuing the means of coercing the debt from him. He must have known, too, that, if the creditor had then gone back upon the mortgage to coerce the debt, Patterson could have secured an indemnity from Wilgus. And by his intervention, he ties up the hands of all concerned; he stops, not only the legal remedy, which would probably have resulted in the speedy payment of the debt, but also, the remedy on the mortgage, which, if then resorted to, would have given Patterson the right to seek an indemnity from Wilgus, when it might have been obtained. Surely he can have no peculiar equity against the creditor whom he has thus frustrated in the collection of his debt; none against Patterson, whose interests he has voluntarily subjected to an increased hazard, which has terminated in depriving him of all means of indemnity from Wilgus; and his equity against Wilgus, for whom he has paid the debt, cannot reach the land, because Wilgus had no interest in it, when he became bound for him.
But having by his own act, with notice of all the facts and rights and duties which have been stated, produced the delay which has resulted in the dilemma in which he now stands, we think the obvious equity of the case is, that he must bear the loss which he has brought upon himself, And that, had the creditor ultimately resorted to the mortgage, after the insolvency of Wilgus, Patterson would have had a better right in equity, to substitute Pope in the place of Wilgus, than Pope now has to substitute Patterson in the place of *250 Wilgus; which would be the effect of considering the creditor’s lien as remaining in full force, for the benefit of Pope.
This being the case, we do not admit that, after Wilgus and his replevin surety had become insolvent, and after the. creditor had levied his execution upon the property of Pope, and was in the act of coercing payment, he could, by then 'assigning the mortgage to Pope, in consideration of his paying the debt, have given him the right to seek his indemnity at the expense of Patterson. The equitable rights of the parties were then fixed. Pope was bound to pay the debt for Wilgus, and, as to all preceding parties in interest, stand in his place. Patterson (as we are inclined to think,) had a right to look to him for indemnity, in case the creditor had thrown the debt upon him. And even an assignment of the mortgage would have been ineffectual to change the rights and attitude of the parties. It is not pretended, however, that there was an actual assignment. The permission to sue in the name of the mortgagee,- who had, in fact, no right to sue when the debt was paid, had no effect upon Pope’s equity. And as, in our opinion, he had no equity to be indemnified out of the land, it was erroneous to render a decree to that effect.
Wherefore, the decree is reversed, and the cause remanded, with directions to dismiss the bill.