PELTON vs. KNAPP and others, impleaded with FARMIN and others.

*Assignment of mortgage, after mortgage debt paid.*

1. A., on becoming bound for B.'s debt to C., took a mortgage from B. as security. Plaintiff paid a part of the debt, without any agreement with A. as to the assignment of the mortgage to him. *Held*, that the lien of the mortgage could not be revived as to such part by a subsequent assignment to plaintiff.
2. Plaintiff furnished money to B. with which he was to go to the places of residence of A. and C., pay the last installment of the debt, and take an assignment of the mortgage. B. paid the money to C., and several days after obtained the assignment. *Held*, that plaintiff could enforce the mortgage lien for said last payment, as against parties claiming under a lien subsequent to the mortgage but prior to its assignment. DOWNER, J., dissents.

APPEAL from the Circuit Court for *Winnebago* County.

Foreclosure of a mortgage. In 1852, Joel and Randall Whiting and Elias Palmer became liable to one Webster for moneys

due him from the defendant *Farmin*, thus releasing certain property of the latter from attachment at the suit of Webster; and *Farmin* thereupon, to indemnify them, executed to them, June 2d, 1852, the mortgage in suit, conditioned for the payment to them of $1500 on the first of December following. In May, 1854, the mortgagees assigned this mortgage to plaintiff, who alleges that no part of the mortgage debt has been paid. *Daniel B. Knapp, Andrew B. Knapp* and *Daniel W. Bradley* (each of whom claimed title to a portion of the land through a sheriff's sale on a judgment against *Farmin* subsequent to said mortgage) answered that the mortgage debt had been fully paid. The evidence on this point was as follows: *Mr. Farmin*, for plaintiff: "The Webster debt has been paid, with *Pelton's* money; $400 was paid to Randall Whiting about 1st of July, 1852; $375 was paid through J. D. Fisk during summer of 1853; Webster then released his mortgage on Randall Whiting's farm, but took a note from Joel Whiting and others for the balance of his claim, which was $137 or $138. *Pelton* sent the money by me to pay the balance of the debt to Webster, which I paid in person to Webster, at Oshkosh, some time in May, 1854, and then took up said note of Joel Whiting and others, and on my way to Prairie du Chien delivered it to Whiting and Palmer. The consideration for the mortgage to *Pelton*, was the amount which he had paid on said Webster claim. I have never paid that claim out of my own money or property, nor have I repaid any part of it to *Pelton*. I think said payments by *Pelton* were made at my request. The mortgage was assigned to *Pelton* at his request made through me. He thought that inasmuch as he had paid the whole of the Webster debt, which the mortgagees had become security for, he was entitled to a transfer of the security which they held. It was done at the house of Joel Whiting in Marquette county. It was after the Webster debt had been paid in full; think it was three or four days after. It was delivered to me." The

plaintiff in his own behalf (his testimony on this point being received against defendants' objection) said: "I paid the whole Webster claim : in July, 1852, $400 ; in the summer of 1853, $375 ; in the summer of 1854, the balance, I think $138. I made the payments at *Farmin's* request." *Question :* "Was there any arrangement between you and *Farmin* in relation to those payments, and if so, what was it ?" Objection overruled. *Answer :* "The mortgage was to be transferred to me, and I was to hold it until I was paid. An arrangement was made when I made the first payment ; that payment was made to Randall Whiting when he came to Prairie du Chien ; he understood the arrangement I had with *Farmin ;* I made the payments under that arrangement ; I made them out of my own money, and have never received any part of it back again. I made the second payment by J. D. Fisk ; it was my money. I sent the balance by *Farmin*, and got the mortgage properly assigned ; on his return he delivered me the mortgage and assignment." Randall Whiting, as a witness for defendants, testified that the mortgagees became liable for the Webster debt at the request of Fisk and *Farmin*—mainly of the former, who was a relative of theirs ; " I went with the attached property (engine, boiler and machinery) to Prairie du Chien, and had security "thereon for becoming security for *Farmin*. At Prairie du Chien Fisk paid me $400 to apply on the Webster debt ; *Farmin* was present at the time. * * *
I released the machinery at Prairie du Chien, so that they could give security on it to *Pelton*, to get the money to pay me. Fisk was acting as *Farmin's* agent. The next payment was made a year from the winter next thereafter ; I made the same to Webster, at Oshkosh ; I received the money or draft from Fisk. I do not know who made the last payment. I was acting on behalf of the mortgagees. We never paid anything on the Webster debt except what we got from Fisk or *Farmin*. Our papers to Webster were given up before we made

the assignment to *Pelton;* we made the assignment to *Pelton* at the request of *Farmin,* and did not receive anything for making it.  *  *  I do not recollect of any agreement between *Pelton* and *Farmin* that *Pelton* was to have an assignment of said mortgage; do not recollect whether or not I saw *Pelton,* when at Prairie du Chien." On cross-examination, he said: "*Farmin* and Fisk both wanted me to release the machinery, so that *Farmin* could give security to *Pelton,* for $400. I got the $400." J. D. Fisk, for defendants: "Two or three days after the machinery arrived at Prairie du Chien, it was transferred to *Pelton,* and *Pelton* at that time paid Randall Whiting $400 to pay to Webster, which he (Whiting) did so pay.  *  *  He unloaded the machinery and put it in a mill which I built for *Farmin* and finished in January, 1853. *Farmin* ran the mill until about the 9th of March, 1853.  *  *  In the fall of 1852, *Farmin* took money from Prairie du Chien, and went to Oshkosh and paid all of Webster's claim, except about $300. In the fall of 1853, I sold the planing machine at Galena, and remitted the proceeds, $300, to Randall Whiting in a draft of Carson & Eaton on Henry Corwith, to pay the balance of the Webster debt. Randall Whiting wrote me in January, 1854, that the money I sent them settled the Webster debt, except two or three dollars. Webster wrote me to the same effect; I am not certain that I received his letter before June, 1854. The letters were destroyed." *Question:* "Why was not the mortgage cancelled when paid?" *Answer:* "I advised letting it stand to avoid another debt owing *Knapp.* I know nothing about the making of the assignment, or the consideration therefor." The plaintiff, being recalled, testified further in his own behalf, that at the time of the arrival of the machinery at Prairie du Chien he paid *Farmin* $750, viz: $400 on the Webster claim, and $350 on account; that he also bought lots on which *Farmin* was to build his mill. "I got no security on the machinery for the $400. Fisk never advised me to take an as-

signment of the mortgage. I never talked with him about it. I sent him to Galena with machinery; it was mine; he brought back a $300 draft and $75 cash; I told him to apply it on the Webster debt; I gave the mill account credit for that machinery." On cross-examination he said: "It was the same machinery brought by *Farmin* from Oshkosh. The lots I bought [in Prairie du Chien for the mill] I took title to in my own name, to hold until *Farmin* should pay me for the advances made. I opened an account with the mill; it had no reference to this mortgage. I made advances, and kept a separate account."

The court found there was due and unpaid from *Farmin* to *Pelton*, on said mortgage, $1,751.46, and rendered judgment of foreclosure and sale for that amount; from which said defendants *Knapp* and *Bradley* appealed.

*Gabe Bouck*, for the appellants, to the point that after a real estate mortgage has been once paid, it cannot afterwards be made, by a parol agreement, effectual as a security for a new debt, cited 1 Hilliard on Mort., 447; *Mead v. York*, 6 N. Y., 449; *Truscott vs. King*, id., 144; *Stoddard v. Hart*, 23 N. Y., 556; *Abbott v. Upton*, 19 Pick., 434. Especially cannot this be done to the prejudice of third persons. *Marvin v. Vedder*, 5 Cow., 671; *Angel v. Boner*, 38 Barb., 425. Even if the plaintiff paid Webster, he is not entitled to be subrogated to the rights of the mortgagees. This happens only when the person who pays or advances the money is bound in the original instrument, as surety or otherwise, to pay the debt. *Downer v. Miller*, 15 Wis., 612; *Wilkes v. Harper*, 1 N. Y., 586. Counsel also argued that the assignment conveyed nothing, because at the time it was made, the mortgagees had no interest.

*Felker & Weisbrod*, for respondent:

The fact that plaintiff had advanced his money under an agreement with *Farmin*, and an understanding with the

mortgagees that the mortgage was to be assigned to him, is proven, first, by plaintiff's positive testimony, not contradicted; second, by the prompt assignment of the mortgage to him after payment of the last installment. 20 N. Y., 395. 2. The fact of payment, connected with an assignment to a third party whose money had been paid, instead of establishing a satisfaction, proves the reverse. *Harbeck v. Vanderbilt,* 20 N. Y., 395–98; *Champney v. Coope,* 32 id., 543. Plaintiff, as surety of a surety, and assignee of a surety, and having paid the debt owing from *Farmin* to Webster, was entitled to all securities held by Webster, or by the mortgagees, against *Farmin.* And the rule does not rest on the foundation of a contract between the debtor and his surety, or between the creditor and the surety, but upon natural justice. 1 N. Y., 595; 5 Barb., 398–413; 3 Sandf., 328; 6 Paige, 32; 9 id., 432; Story's Eq., 502. A court of equity will keep an incumbrance alive, or consider it extinguished, as will best serve the purposes of justice, and the actual and just intention of the party. 9 Wis., 515.

DIXON, C. J. The plaintiff testifies that an arrangement was made at the time he made the first payment, that the mortgage was to be transferred to him, and he was to hold it until he was paid. If such arrangement had been perfected with the mortgagees, or with Randall Whiting, who was one of them, little or no difficulty would have been presented by the case. The plaintiff would then have come in purely in the character of assignee, and, as such, his rights would have been paramount to those of the defendant *Daniel B. Knapp* under the lien of the judgment in his favor. But the inference from the plaintiff's testimony is, that the arrangement was made with *Farmin,* the mortgagor, and not with the mortgagees or with Randall Whiting, though he says that Randall Whiting " understood the arrangement I had with *Farmin.*" If there were any cor-

roborating evidence upon this point, and it had appeared that Whiting assented to the arrangement, the assignment migh still be upheld as against the *Knapp* judgment. But there i no such evidence, and no proof that the mortgagees ever gav their assent until the assignment was in fact made, in May, 1854. On the contrary, Whiting testifies that he has no knowledge or recollection of the arrangement; and Fisk denies that any was ever made. *Farmin* is not interrogated, and does not speak directly to the point; but I conclude, from what he does say, that the arrangement was not made until he went to Oshkosh to make the last payment to Webster. Under these circumstances, I think the fact must be found against the plaintiff; and then the question arises, whether it was competent for the parties at that time, by the form of an assignment, to revive the mortgage as to the payments previously made, so as to take precedence of the lien of the *Knapp* judgment? In other words, the question is, whether as to those payments the mortgage had not been extinguished. I think it had; and if so, it was clearly not in the power of the parties, mortgagor and mortgagees, to revive it so as to to dispossess or postpone the lien of the judgment which had already attached. As between the immediate parties, it might, perhaps, have been thus revived, but not so as to defeat the intervening interest of a third person. See *Patterson v. Pope*, 5 Dana, 241.

The conclusion that the mortgage was extinguished as to all the sums paid except the last, seems to me very plain. Those sums were received by the mortgagees, or by Webster for them, either as payments, or as so much money to be applied on an agreement to assign the mortgage when the whole should be paid. There was no such agreement on the part of the mortgagees to assign, and consequently the money must have been received in payment. It was so regarded by the mortgagees; and being so regarded by them, the sums received con-

stituted in law valid and effectual payments. The case in this respect differs materially from that of *Downer v. Miller*, 15 Wis., 612. There the lender constituted the borrower his agent to receive the money, and with it to procure an assignment of the judgment to the lender. Instead of fulfilling the duties of his agency, the borrower was guilty of gross fraud in procuring the judgment to be satisfied. The greatest injustice would have ensued if we had passed by the intention of the lender, and had been governed by that of the creditor receiving the money, to whom it was a matter of utter indifference whether the money was paid in satisfaction or in consideration of a transfer of the judgment. No reason was perceived why the fraud should be more successfully perpetrated by the borrower in his capacity of agent, than if the money had been entrusted to a stranger to the judgment, and he had been guilty of a like fraud. If an agent, entrusted with funds to buy land for and in the name of his principal, should violate his trust by buying and taking title in his own name, no one would doubt that a court of equity would relieve the principal even as against a creditor of the agent claiming a lien by judgment, and notwithstanding the vendor, at the time of the sale, had no intention of selling or conveying to the principal. The same rule was applied in that case. It turned upon the question of fraud. Here, however, there was no agency on the part of the borrower, and no fraud as to the application of the two first payments. The plaintiff, the lender, undertook the management of the affair himself. He made those payments; and if the business was so conducted that he cannot now succeed to all of the rights of the mortgagees in the first instance, it is his own fault. If he wished to preserve the lien of the mortgage, or to assume the character of a purchaser according to his arrangement with *Farmin*, he should have apprised the mortgagees, and have obtained their assent *at the times of payment;* for otherwise the transactions were fixed as *payments* by

the money being received and applied as such, and could not afterwards be changed to suit his convenience, or so as to give him preference over another creditor of the mortgagor, whose lien, though subordinate to that of the mortgage, is prior in date to the assignment.

I am aware that some general expressions are to be found in the books, to the effect that where money is paid by one not a party to the instrument or liable upon it, but by some third person, the debt will be extinguished or not according to the intention of the party paying. But such expressions are not to be separated from the facts of the cases in which they occur. They are to be taken in connection with those facts, and not as independent propositions of law. It will appear from examination, that the intention of the party paying was invariably communicated to the creditor *at or before the time of payment*, and that the creditor consented to receive the money not in payment but in consideration of a transfer of the debt or demand. Such was the case of *Harbeck v. Vanderbilt*, 20 N. Y., 395, where the note was delivered to the plaintiffs in the judgment, and the judgment was at the same time assigned as an indemnity for the endorser of the note. The same is likewise true of *Champney v. Coope*, 32 N. Y., 543, in which the assignment was upheld only as to those sums which were paid *after* the mortgagee had agreed to assign the bond and mortgage. As to the $1200 paid *before* the mortgagee's agreement, it was held that the mortgage was extinguished, and could not be enforced by the assignee. I do not think any case can be found where the mere intention of the person paying, not communicated to the creditor at or before the time of payment, has been held to change the nature of the transaction.

The foregoing observations are applicable only to the two first payments. As to the last, it appears that the plaintiff furnished the money with which *Farmin* was to go to Oshkosh and complete the payment of the Webster debt, and take an

assignment of the mortgage to the plaintiff for his security. *Farmin* did so, and so far I think the transaction valid, and the lien of the mortgage not extinguished. In this respect it is like the case of *Downer v. Miller*, except that there was no violation of duty on the part of the agent. It was the same as if the plaintiff himself had procured an assignment of the mortgage in consideration of paying the balance of the debt.

For these reasons I am of opinion that the judgment as it now stands should be reversed, and the cause remanded with instructions to enter judgment for the plaintiff for $138 and interest from the 12th day of May, 1854, being the amount of the last payment with interest from its date.

COLE, J., concurred in the above opinion.

DOWNER, J. I concur in the opinion of the chief justice as to the two first payments made on the note to Webster signed by the mortgagees. But I disagree with the majority of the court as to the last payment, holding that the mortgage ought not to be enforced even for that amount, and that the lien thereof is entirely extinguished. *Farmin* testifies as to the time of making the assignment: "It was after the Webster debt had been paid in full. I think it was three or four days after Webster's debt had been paid. It [the assignment] was delivered to me personally." If the mortgagees had themselves paid the last installment to Webster, they would then have had a right to enforce the mortgage to the amount of such payment; but they never paid any part of the debt, to indemnify them against which the mortgage was given, and consequently never had any right to foreclose the mortgage, nor any interest which they could transfer to *Pelton*, certainly none after the debt to Webster was paid by *Farmin*, their principal, or by *Pelton* at his request. If *Pelton* desired to keep alive and avail himself of the mortgage as a security to reimburse himself for the money advanced, he should have *first*

arranged with the mortgagees that they, or he for them, should pay the money to Webster, and that, in consideration of such payment for them, they would assign him the mortgage. But without any agreement or understanding with the mortgagees, the debt to Webster was paid by *Farmin*, as he says, with *Pelton's* money. Such payment *instantly extinguished* the debt and the mortgage lien. The subsequent assignment by the mortgagees, or any agreement they could make, could not revive the lien as against a prior judgment creditor of *Farmin*. There is no pretense for saying that *Farmin* acted fraudulently, or with any intention to injure *Pelton*. The most that the evidence tends to prove is, that *Farmin* made a mistake, not of fact but of law. And the plaintiff is entitled to no relief on that account. I am of opinion therefore that the judgment should be reversed, and the complaint dismissed.

*By the Court.*—Judgment reversed, and cause remanded with instructions that judgment be entered in favor of the plaintiff for $138, and interest from May 12th, 1854.